Curtis et al. *v.* Blair.

26 309
e71 939

26 309
d76 341

HENRY T. CURTIS et al. *v.* ALEXANDER C. BLAIR.

B. applied to P. (agent of C.) to purchase certain land, and afterwards P. wrote a letter to B., informing him that he could have the land, provided he came to close the trade within two weeks from the time of writing; setting forth at the time the terms of sale and a description of the property. *Held*, that the

moment the terms should be accepted and complied with by the other party, the transaction become mutual as to all rights and liabilities resulting from it, and the acceptance would create the mutuality necessary to a complete contract.

The statute of frauds does not require that the appointment of an agent to make a " note or memorandum in writing," should be in writing, nor does it require that the signature should be in the name of the principal. *Held*, that it is sufficient, if the contract be in writing, and signed by the agent authorized to act therein.

The consideration moving to C. in this transaction would have been the benefit to be derived from the subsequent completion of the contract on the part of B., and if not completed, it was only a simple proposition unaccepted.

It has been held, that where a party is bound to perform a contract within a stipulated time, he has until the last moment of the last day to discharge himself; but he must perform it within a reasonable time, which is to be regulated by all the circumstances of the case.

The offer of performance, though within the time limited, if it be near its termination, is required to be made at a proper place, and within sufficient time to allow the adverse party to protect his interest, and act with due caution and consideration in the completion of the contract.

Where time is the essence of a contract, and if the one party is not ready and able to perform his part of the agreement on the day fixed for the performance, the adverse party may elect to consider it at an end. 9 S. & M. 612; 7 How. 172, cited and affirmed.

Where the ground of a controversy is the mere pecuniary value of lands in dispute between parties contending for them, the damages therefore could be recovered in an action at law, and courts of equity in such cases would not interfere except under special circumstances.

On appeal from the northern district chancery court at Holly Springs; Hon. Henry Dickinson, vice-chancellor.

Alexander C. Blair filed his bill in the district chancery court at Holly Springs against the appellants, Curtis, Crawford, and Ayres, for the specific performance of an alleged contract in relation to a section of land in Tippah county, and known and designated as section 29 in township 2 of range 1 east, of the basis meridian of the Chickasaw mission.

The bill states that H. T. Curtis, being the owner of said section of land, appointed one Joel Pinson his agent to sell said section; that the appellee, A. C. Blair, on the 22d of August, 1850, by his agent, S. R. White, called on said Pinson to ascertain the price of said land and the terms of sale; that

said Pinson stated the price to be $4 per acre, and the terms one quarter in cash, and the balance in one, two, and three years; that upon said White desiring said Pinson to give Blair the refusal of said land, he declined, because, as he stated, there were several applicants for the land, to whom he had written, and that he would close the trade with the first who came prepared to meet the terms; that the same day Pinson addressed a letter to said Blair, setting forth what had transpired between him and White; that on receiving said letter, Blair made his arrangements to comply with the terms as offered, and on the 24th of August, 1850, by his friend and agent, S. R. White, proposed to said Pinson to take the land on the terms proposed; that this offer was made late at night, and Pinson proposed to defer its consummation, and agreed that the trade might be closed by said Blair within two weeks from that date (the 24th); that on the 24th of said month of August, Pinson addressed another letter to Blair, stating that "Mr. White had succeeded in getting the land, provided said Blair came down to close the trade within two weeks from the 24th, on the terms mentioned in a former letter;" that before the expiration of the two weeks, on Saturday, the 7th of September, 1850, Blair, by his agent J. B. Herring called on Pinson at his residence in Pontotoc, and proposed and offered to comply in all respects with his said contract; that the money was then in readiness, and that Blair, by his agent, was prepared to do every thing which, by the terms of his contract, he was required to do; that Pinson, for the first time, declined closing the trade, alleging as a reason, that he, Pinson, understood that the land was worth more than he sold it for. The bill further states that the contract, on the part of Blair, was firmly made, and that Pinson, who was the authorized agent of Curtis, dictated the terms, recognized the contract, and spoke of having sold the land to Blair, to divers persons, and among others to G. W. J. Crawford; that after this, Pinson sold the land to said Crawford and Ayres; that said Crawford and Ayres had full knowledge of Blair's having purchased said land; that said Crawford and Ayres have as yet paid but a small portion of the purchase-money of said land, and have not as yet received a title to the

same. The bill further avers a readiness and willingness, upon the part of Blair, to comply with his contract, and prays for a rescission of the contract between Curtis and Crawford and Ayres, and that the contract made by Blair be enforced and specifically performed.

The answer of H. T. Curtis states, that he was the owner of the said land, section 29, township 2, range 1 east; that he did, through his agent and attorney, P. J. Maver, appoint Joel Pinson his agent, under said Maver, to sell all his lands in Mississippi; that he knows nothing, personally, about the said pretended purchase stated by said Blair in his bill; that, as he has been informed and believes, no legal or binding contract for the sale of said section of land to said Blair was ever made by said Pinson at the time stated in said bill, or at any other time; that there were propositions, as he has been informed, made and considered by said Pinson and Blair, relative to said section of land, about the time mentioned in said bill; but that none of said propositions were legally binding on either party, nor were any of said propositions strictly complied with or accepted by said Blair; that the facts relative to the whole affair are, as he has been informed and believes, as follows: that some time after night, on the 23d of August, 1850, S. R. White called at the house of said Pinson and informed him that he had called to purchase said section of land for said Blair, and proposed to take it at the price and upon the terms set out in the bill, the said White saying also that Blair would be down in a few days to make the cash payments; that Pinson verbally agreed to accept this proposition, but declined closing the trade until Blair should come down; that said Pinson also agreed to give Blair a week or two to close the trade; that this agreement was made at the residence of Pinson after night, and after Pinson had closed his office, and after the business hours of the day were over; and that the residence of said Pinson was more than half a mile from his office; that no written agreement, or memorandum in writing, was made by said Pinson, as agent of said Curtis, nor was there any money paid, nor was any writing of any kind made by either party, nor was possession given; that about the 26th of August, 1850, Pinson

wrote the letter referring to the verbal contract, or rather agreement between him and White, and that no other contract or agreement was entered into by Pinson; which agreement, the answer insists, does not, by any fair or legal construction, constitute a contract for the sale of land, but, on the contrary, is nothing more than a proposition to sell; that said letters exhibited were signed by Pinson in his individual capacity, and not as agent of Curtis; that said letters are submitted to the court for a legal and equitable construction, and that strict proof is called for of any contract, if any was made. The answer also denies that any contract was ever made which was binding, either in law or in equity, upon said Curtis, for said land. The answer further states that Blair did not carry out, or offer to carry out, the said verbal agreement within two weeks from the 23d of August, or the 24th of August, 1850, to which time the letter of Pinson may seem to extend it; that the time was permitted to elapse, and did elapse, before any offer to comply with the terms proposed in said letters by said Blair. The answer further denies that Blair, either by himself or any agent, offered to comply, in all respects, with said verbal agreement on the 7th of September, but, on the contrary, states as follows: that, some few minutes before 12 o'clock on the night of the 7th of September, that day being Saturday, one J. B. Herring called at the house of Pinson, after he had retired to rest, and stated to some inmate of the house that he, Herring, had come to consummate the trade about said land; that said Herring did not see Pinson, neither did he have any conversation with him that night; that Pinson's residence is more than half a mile from his office, and without the limits of the town of Pontotoc; that Pinson, had he been so disposed, could not have gotten up, dressed himself, and repaired to his office and prepared the papers necessary to consummate said verbal agreement before the hour of 12 o'clock, or, in other words, before Sunday morning; that Pinson had been in his office during all the business hours of the day, the 7th of September; had closed his office at the close of the day, and had gone home and retired to rest. The answer, therefore, insists, that even if the verbal contract, stated as above, should be binding, yet the

said Blair did not comply with the terms of said agreement, in letter or spirit, in law or in equity; and the answer calls for strict proof of Blair's performance of, or offer to perform said agreement. The answer further insists, that an offer to perform, made at the residence of Pinson, even if made in time, would not have been an offer to perform within the meaning of any contract or agreement between the parties, the fact being notorious and well known to Blair and his agents, that Pinson kept an office in Pontotoc, where he transacted his business. The answer also calls for the production of the authority which the said White and Herring had from Blair to make the trade with Pinson. The answer admits the sale to said Crawford and Ayres, but denies that they had any notice of any sale to complainant Blair. It also states that Crawford and Ayres paid Pinson, at the time of sale, $640, and executed their notes for the residue of the purchase-money; that said notes are not yet matured, and are in the hands of Curtis, by his agent. The answer further states, that at the time of the sale to Crawford and Ayres, Pinson had not received his regular authority to sell; that Pinson executed an irregular bond for title to them, and afterwards, having received his authority, executed to them a regular bond for title; that the contract with Crawford and Ayres was fair, honest, and *bonâ fide*, and untainted with fraud, covin, or collusion; and that the same ought to stand and be carried out. The answer also insists, by way of demurrer,

1. That the contract in said bill mentioned is for land, and is not averred or charged to be in writing signed by the party to be charged.

2. That the contract set up in said bill does not show or charge any liability on the part of the complainant to this respondent, which could be enforced by him.

3. And for other causes apparent on the face of said bill.

The answer of Crawford adopts the answer of Curtis, except so far as the same may be inconsistent with the facts stated in his answer. The answer states that on the 24th of August, 1850, he went to Pontotoc to purchase the land in controversy, and that he was informed by Pinson that it was sold to complainant. That

Curtis et al. v. Blair.

afterwards he (respondent) was informed that the land was in market, and that he purchased the same for himself and his codefendant Ayres. That at the time he purchased he had no notice of complainant's claim to said land. That said purchase was made in good faith, and without fraud of any kind whatever. That at the time he made the purchase, Pinson had no authority from Curtis to sell, or had not received his appointment to sell said land. That he (Pinson) only sold by some verbal understanding with an agent of said Curtis. The answer of Crawford also insists upon the causes of demurrer set forth in Curtis's answer.

The answer of Ayres denies all knowledge of the purchase by complainant, and adopts in full the answer of Curtis.

A decree was made in favor of complainant, and defendants prayed an appeal to this court.

*Word* and *Freeman* for appellants.

There was no legal or binding contract between the parties. The letters do not constitute a contract. The agreement must be ascertained from the letters or from some agreement in writing referred to by them, and should show the assent of both parties. 1 Comyn on Cont. 100, &c. See also the case of *Cook* v. *Toombs*, a case referred to in the above authority. These authorities show that a particular of sale signed by the party will not do, unless the purchaser purchase by it, or sees it at the time of sale. Blair did not purchase by these letters. The letters only announce that a verbal agreement had been made with White. The contract, moreover, is an entire one, and if a part be void the whole is void. The statute is negative, and does not import that every contract in writing is to be carried out. 2 Hovend. on Frauds, 8; 9 Peters, 214. The letters do not purport to be made by Pinson, as agent. They show no attempt to execute a power. They are signed by Pinson in his individual capacity. 12 S. & M. 541; Hutch. Code, 637; 1 Johns. Ch. R. 282, 370.

The contract must be mutual. 1 Johns. Ch. 131; Ib. 370, and 8 Term. R. 151, as to signature.

Because the verbal contract made by White, as the agent of

Curtis et al. *v.* Blair.

appellee, cannot aid the letters. And also because said contract is void by the statute of frauds.

The contract set forth by the bill, without the letters, is undoubtedly void by the statute of frauds. It will not, we apprehend, be contended, that apart from the letters, there was any contract at all binding upon the appellant Curtis. The contract, if any was made, was a mere verbal one, and relating to land; it was, by the statute of frauds, absolutely void. *Box* v· *Stanford*, 13 S. & M. 93; Hutch. Code, 637; 1 Johns. Ch. R. 282; *Beaman* v. *Buck*, 9 S. & M. 207. Do or can the letters exhibited have the effect of taking the case out of the statute of frauds? In order to determine this question, it is necessary to consider the effect of the letters themselves, and of the intention of the party writing them, and the capacity in which he wrote them. The letters are nothing more than propositions to sell. Of themselves they cannot, and do not, constitute a contract. It is absolutely necessary to refer to parol proof in order to connect the letters with some transaction necessary to make a contract. The letters merely state the price at which the land was held. (The same letter having been written to several others besides Blair, the complainant below.) One of the letters, it is true, states that "Mr. White did succeed in getting section 29, township 2, range 1 east," "provided you come to close the trade within two weeks from the 24th;" and this is left uncertain and vague, and its meaning dependent upon parol testimony.

If the court should think this verbal contract is not within the statute of frauds, still it is clearly without any consideration, and void.

A contract, to be binding, must be mutual. Both parties must be bound, or neither. The case at bar is like a promise to forbear without consideration. It is therefore void, and not binding. 1 Comyn, 8–13; 3 Term R. 653; 3 S. & M. 660. On this point, many of the authorities above cited bear with force.

Even if the contract is without the statute of frauds, and based upon a sufficient consideration, yet the appellee is not entitled to relief, because he did not perform or offer to perform

his part of the contract within the time limited by said contract, as set forth by appellee.

The time mentioned in the letter of the 26th of August, is " within two weeks from the 24th." This also is the time specified in White's deposition. The time, therefore, from which it should begin to run was two o'clock, A. M., on Saturday morning, the 24th August, 1850. Pinson testifies that it was before midnight of the 23d of August that White called. White says it was at 2 o'clock, A. M., on the 24th of August, that day being Saturday. In either case, however, the two weeks would expire by 2 o'clock, A. M., Saturday morning, the 7th of September, 1850. Herring, the agent of Blair, did not call until a few minutes before 12 o'clock, P. M., Saturday the 7th of September, and then after Pinson had retired to rest. We contend that, by this hour, the time had long expired, and that appellant was not bound to comply with the contract, even if any existed. The contract was made, according to the testimony, on the morning of the 24th of August, that day being Saturday. If the law, now, knows no fraction of a day, as contended, the time commenced from 1 o'clock, A. M., of that day.

There is no case to us more similar to this than that of the holder of a bill of exchange or note which should be presented for payment. In that case the bill or note should be presented at the known place, and within the known hours of business of the maker, if he had any; if not, then at any time during the day on which the bill or note fell due, " not during the hours of rest." Chitty on Bills, 420, 421, 422; 22 Eng. Com. Rep. 57; Barn. & Adol. 158. If the cases are similar, and we contend they are, then the offer to perform should have been made by Blair at the place of business of Pinson, and during his hours of business, if he had any known place of business and hours of doing business. If he had none, then Blair should have offered to perform his contract at some hour of the day, on Saturday, the 7th, " however late in the evening," provided that hour was " not during the hours of rest." Apply this law to the testimony in this case, and it is conclusive that Blair did not offer to perform in time.

Perhaps this case may be likened to a forfeiture. If so, then

27*

the time should be computed from the time the act was done; that is, from the time the trade was made. In such case, the day on which the trade was made would be included, and the time would have expired on Friday, the 6th of September, 1850. *Cathcart* v. *Burdett*, 3 Term R. 623; *Glassing* v. *Dickey*, 3 East, 407.

But liken it to any case. Make it an exception to, or rather a case not governed by, the rules applicable to bills of exchange and notes; and still, was the tender or offer to perform made by Blair sufficient to entitle him to the relief prayed for in the bill? Was the tender or offer to perform made at a reasonable time, taking it for granted that Saturday was the last day, and that it extended to 12 o'clock at night?

Even if the day should be deemed to extend to 12 o'clock at night, yet the tender must be made in a reasonable time; at a sufficient time to leave the party an opportunity to count the money, weigh it, or test its genuineness, and do every thing requisite to be done by 12 o clock. In the case of *Startup* v. *McDonald*, 46 Eng. Com. R. 573, this question is fully and ably discussed. In this case the defendant had contracted to buy from plaintiff a certain quantity of oil, to be "delivered within the last fourteen days of March." A tender of the oil was made by plaintiff on the 31st of March at the warehouse of defendant, at half past eight at night, and its acceptance refused by the defendant. The jury returned a special verdict "that the time was unreasonable, but that the defendant had time before 12 o'clock to examine, receive, and weigh the oil." Upon this verdict the court of common pleas rendered a judgment for the defendant. Being brought by writ of error to the exchequer chamber, the court then, the lord chief-justice dissenting, reversed the judgment below. The opinion of the court is based upon the verdict of the jury, "that the defendant would have had time to weigh, &c., the oil before 12 o'clock." In this opinion, however, they clearly sustain the position which we have taken. Baron Rolfe, in his opinion, page 609, says: " The contract was to deliver the oil before the end of March. The plaintiff did, in pursuance of that contract, tender the oil to the defendant at a time which, according to the finding of the jury,

left him full opportunity to examine, weigh, and receive it before the end of March."

*Stearns, Harris,* and *Glenn,* on the same side,

Referred to the following authorities: 2 Pet. 97, 101; 19 Maine, 31, 35; 8 Port. (Ala.) 156, 162; Chit. on Bills, 420–422; *Wilkins* v. *Jodis,* 22 Eng. Com. L. R. 57; 46 Ib. 591, 593; 3 Term R. 623; 3 East, R. 407; *Benedict* v. *Lynch,* 1 Johns. Ch. R. 370; *Hatch* v. *Cobb,* 4 Ib. 560; 11 Paige, Ch. R. 277; 13 Ves. 225; 17 Ib. 280; *Falls* v. *Carpenter,* 1 Dev. & Bat. Eq. R. 283, 287; *Roach* v. *Rutherford,* 4 Dessau. 131; 3 Leigh, 161; Ib. 187; 3 Rand. 238; 1 McLean, R. 375; 7 Ohio .R. 90–97; 16 Maine R. 92; *Hester* v. *Hooker,* 7 S. & M. 768; *Liddell* v. *Sims,* 9 Ib. 596; *Johnson* v. *Jones,* 13 Ib. 580.

*Watson* and *Craft* for appellee.

An agent may be constituted by parol for the sale of land. Sugden on Vendors, 69, 70; Story on Agency, 50, 51, and notes; 4 Bibb, 297; 10 Humph. 498; 9 Leigh, 387.

That the signature of the agent to the contract, the name of his principal not appearing, will bind his principal. Story on Agency, 270, and notes; 12 S. & M. 541; 9 Leigh, 387; *Vanado* v. *Alvis,* 7 Adol. & Ell. 486.

That it is enough for the contract to be signed by the party to be charged therewith. Sugd. 56; 2 Robins. Ch. Pr. 169; 3 Ves. & Beam. 192; 2 Ball & Beatty, 370; 3 Cond. Eng. Ch. R. 675; 14 Johns. 489.

That the two letters taken together, when acceded to by complainant, constituted a contract binding on Curtis. 4 Eng. Com. L. R. 323; 14 Pet. 82, 83; 6 Wend. 103; 7 Dana, R. 282; *Connell* v. *Mulligan,* 13 S. & M. 388.

That the 24th of August is to be excluded in computing the "two weeks" allowed, by the contract, to complainant. 3 Denio, 12, 15, 16; 3 U. S. Dig. 518, § 4, and authorities there cited; 5 Humph. 622, 623; 1 Pick. 485; 6 Cow. R. 659; 2 Hill, R. 356; 10 Wend. 422; 17 Ib. 329; 9 Ib. 348; 11 Mass. 204; 15 Ib. 193; 1 Pick. 485; 5 Ib. 520; 2 Brown, 18; 4 Blackf. 329; 1 Ib. 329; 9 Cranch, 104; 4 Wash. C.

C. R. 232; 3 Chit. Gen. Pr. 108–110; Bouv. Law Dic. Tit. " Time."

That the offer to make the cash payment on the contract before twelve o'clock, P. M., of Saturday, the 7th of September, was in time to save the forfeiture of the contract by complainant. 11 Paige, 352; 5 Humph. 619; 4 Term R. 173. In this last case, the law is thus stated : —

" In the case of mortgages, bonds, and a variety of other instruments, whereby parties oblige themselves to the performance of certain duties, as to pay money within a certain time, we find the rule to be, without any exception, that the party bound has till the last moment of the day to deliver himself from the obligation by paying. . . . It may be said that there is a difference in the law, as applicable to contracts and forfeitures, but it is better that there should be one general and invariable rule for all cases, and adapted to the understanding of all men."

Even in the case of commercial paper, it is held, that whilst demand may be made for its payment, and protest for non-payment, within business hours, still " the maker has the whole of the day to pay in, if he thinks proper to seek the holder." 3 Wend. 171. In this case it is said: " It is undoubtedly true, in relation to other contracts," (the case was on commercial paper,) " that the party has until the last instant of the day to make payment, and I perceive no reason for making negotiable paper an exception to the general rule."

In 11 S. & M. 452, these principles are fully recognized. A suit was brought on a promissory note, payable 1st March, 1846, and was instituted March 4th. The note was held to be entitled to three days of grace, and the suit therefore prematurely brought. The court say, " The maker had until the expiration of the fourth day to pay the note," thus deciding that suit could not have been brought earlier than the 5th. Fractions of a day are not noticed. 4 Comst. R. 418 ; 3 Cow. R. 19 ; 3 Den. R. 263.

The material matter in this case was not that the contract should be closed within two weeks from the 24th, but that the vendee, within that time, should " come to close it;" and the

vendee, by his agent, did offer to pay the cash instalment within the two weeks from the 24th, and presented himself, in readiness in all things, to close the trade.

That, in computing two weeks from the 24th, the 24th is to be excluded, necessarily results from the meaning of the language. Two weeks from a given time, certainly means from the expiration of that given time. In addition to the conclusive authorities heretofore quoted on this last point, 7 Blackf. 610, Herring says, that, at the close of his interview with Edmondson, on the night of 7th September, it was fifteen to twenty minutes after eleven o'clock.

There is no pretence for the denial of the agency of Pinson at the time of this contract.

We charge his agency in the bill, and the defendant Curtis, in his answer, says : " And he admits as true, that he did, by and through his agent and attorney in fact, P. J. Weaver, appoint the said Joel Pinson his agent and attorney in fact, under said Weaver, to sell lands for him." It is only denied in the answer, that Pinson, at the time of the contract, " had received his regular authority to sell said land." And by this is meant a power of attorney ; but this regular authority was not necessary, as we have seen, to the agency. Pinson says, that he had made up his mind, if Blair called in time to comply with the contract he should have the land. That on Monday, the 9th, he told White that Blair had not offered, in time, to comply. And he also told Herring the same thing ; establishing clearly, that, agent or no agent, he felt fully authorized to act. And further, Pinson informs us, that the power of attorney, which he did not receive until the 18th November, was executed and duly verified as early as August preceding ; and when received, this power of attorney certainly had relation back to the time of its execution. And, moreover, he tells us, in his deposition, that it was in May, 1850, that Waller called on him for Weaver, and told him to take charge of the lands, and act as agent ; and Weaver and Curtis both sanctioned the act of Waller. Indeed, it will be seen, that the objection as to the agency, is only a quibble predicated on the fact, that the

power of attorney was not placed in the possession of Pinson until November. That Pinson was agent by parol before the alleged sale, no one denies; and this is enough, as the authorities quoted show.

As to the contract, we refer only to Pinson's letters.

Mr. Justice HANDY delivered the opinion of the court.

The appellee filed this bill in the district chancery court at Holly Springs, for the specific performance of a contract for the sale of a tract of land, under the following state of facts.

On the 22d August, 1850, one Pinson, as agent for the appellant Curtis, addressed a letter to Blair, the appellee, stating, in substance, that their friend White had called upon Pinson, to purchase a tract of land for Blair, which Pinson understood to be the land in controversy in this case, though White did not know the numbers of it; that he could not make the sale, because negotiations were then in progress between him and one Jones and Crawford, for the purchase of the land, but that it was probable they would not be able to comply with the terms, and that Blair might still be able to secure it, and to do so before the other parties, and expressing a desire that Blair should be the purchaser. This letter stated the price and terms at which the land was offered for sale.

Shortly after this, Pinson addressed Blair the following letter: —

"Pontotoc, August 26th, 1852.

"A. C. Blair, Esq.

"Sir, — Within the last half hour I have sold the north half of section twenty-four, township two, range one east, to James W. Merritt. Since then I have received yours of the 24th, and hasten to reply, that the south half can be had for $920, the market price, one fourth cash, balance at one, two, and three years, with interest from date. I can't divide it; would be glad to sell it soon to you, or any good man.

"Mr. White did succeed in getting section twenty-nine, township two, range one east," (the land involved in this suit,)

" provided you come to close the trade within two weeks from the 24th, on the terms mentioned in my letter by Mr. White. The .land is too much in demand to wait long before it is closed.                       Yours truly,       Joel Pinson."

Pinson was acting as the agent for Curtis, the owner of the land, under authority derived from another agent of Curtis, and Curtis sufficiently admits his agency in his answer to the bill. Blair resided in Tippah county, and on the 6th September, 1850, in consequence of the last letter of Pinson, he employed one Herring, as his agent, to go to Pontotoc, and take the sum which was to be paid in cash for the land to Pinson. This agent called upon Pinson at his place of abode, which was about half a mile from his office, his known place of business, where his books and papers were kept, and where all matters connected with his land agency were transacted. It was then, according to Blair's witness, fifteen or twenty minutes after eleven o'clock, and according to another witness, it was fifteen or twenty minutes before twelve o'clock, and Saturday night. Pinson had retired to bed, and was asleep. Herring aroused the family, and sent information to Pinson that he had come to pay the money on the purchase of the land for Blair; but Pinson declined taking any further step in the business, complaining that Blair had not come sooner, and intimating that he had not complied with the contract. When again applied to by Herring on the following Monday, he declined to carry out the contract. Herring did not bring the notes for the credit portion of the purchase-money, and was not authorized by Blair to execute them. The land was afterwards purchased of Pinson by the appellants, Crawford and Ayres, who were informed by Pinson that the contract with Blair was at an end, and who thereupon paid part of the purchase-money in cash, and executed their notes for the residue, taking a bond for title.

The vice-chancellor decreed that the sale to Crawford and Ayres be cancelled, and that the contract of sale to Blair be specifically executed.

In the consideration of this case, several points of an incidental character have been discussed, which we deem it

proper to dispose of, before we proceed to consider the main questions upon which the propriety of the decree below depends.

First, it is contended, in behalf of the appellants, that the facts of the case show no valid contract; that the agreement was verbal, and not binding, under the statute of frauds; that the letters of Pinson do not satisfy the statute, because they were mere propositions to sell the land. It is true, that when the letters were written they were but propositions to sell. They contained, however, a description of the property and the terms on which it was proposed to be sold, and every requisite of certainty and identity without resort to other proof. It bound the party "to be charged therewith," by whom or in whose behalf it was made, according to its terms; and the moment it was accepted, and the terms complied with by the other party, if that were done, the transaction became mutual, as to all rights and liabilities resulting from it. The acceptance, if duly made, created the mutuality necessary to a complete contract. *Adams* v. *Lindsell,* 4 Barn. & Ald. 681; *Carr* v. *Duvall et al.* 14 Pet. 77; *Maclin* v. *Frith,* 6 Wend. 103.

Secondly, it is said that the letters are signed by Pinson in his own right, and not as agent for Curtis, and that it is incompetent to show *aliunde,* and especially by parol evidence, that he was acting as agent. The statute does not require that the appointment of the agent to make the "note or memorandum in writing," should be in writing, nor does it require that the signature should be in the name of the principal. It is well settled that the statute is satisfied if the contracts be in writing and signed by the agent authorized to act therein. *Yerby* v. *Grigsby,* 9 Leigh, 387; 6 Ad. & Ellis, 486; 33 Eng. C. L. R. 122; Story on Agency, § 270.

In this case, though the strictly formal authority of Pinson is disproved by his own testimony, yet he shows that he was acting as agent under an informal authority, and the answer of Curtis sufficiently admits that he was acting as his agent.

Again, it is contended that the contract arising from the letters was without consideration, because there was nothing obligatory on Blair at the time the letters were written. By

reference to the last letter, it will be seen that the purchase had already been made by White for Blair, "provided he should come to close the trade within two weeks," on the terms stated in the previous letter. The consideration, then, moving to Curtis, was the benefit to be derived from the subsequent completion of the contract on the part of Blair. If the agreement had not been complied with by Blair, the matter would have been a simple proposition unaccepted. But the benefit in contemplation to Curtis, was the purchase-money for the land, and in consideration that Blair would pay that, or agree to pay it within the time stipulated, he agreed to sell the land. When Blair accepted the terms, and complied or offered to comply with them, according to the stipulations, the anticipated benefit was realized to Curtis, and the contract complete on both sides.

Considering this, then, a sufficient agreement to charge Curtis, under the statute of frauds, let us inquire, 1st, whether its terms were sufficiently complied with on the part of Blair to entitle him to the benefit of it against Curtis; and, 2d, whether under the circumstances he should have a specific enforcement of it against the rights of Crawford and Ayres.

1. First, did Blair sufficiently comply with the agreement in point of time? By its terms he was entitled to the benefit of it, "provided he came to close the trade within two weeks from the 24th" of August, on the terms previously mentioned. The computation of the time, under this phraseology, must commence on the 25th of August, excluding the 24th. 1 Cow. 714; 1 Pick. 485; 6 Cow. 659; Chitty on Bills, 404. So that the two weeks would transpire with the 7th September. It appears that Blair's agent called on Pinson between the hours of 11 and 12 o'clock at night on that day, at his residence half a mile from his known place of business, where his books and papers pertaining to land matters were, and where he would have had to go to transact this business properly. He had retired to rest and was asleep, and it appears that he could not have got up and dressed himself and gone to his office and completed the business before the hour of 12 o'clock.

It has been held that, where a party is bound to perform his contract within a stipulated time, he has until the last moment

of the last day to discharge himself. But it is also well settled that he must perform it within a reasonable time, which is to be regulated by all the circumstances of the case. 3 Sum. 530. The offer of performance, though within the time limited, if it be near its termination, is required to be made at a proper place, and within sufficient time to allow the adverse party to protect his interest, and act with due caution and consideration in the completion of the contract. The soundness of this rule is very ably illustrated in the case of *Startup* v. *McDonald*, 46 Eng. C. L. R. 591; *Davy* v. *Wing*, 7 Maine (Greenl.) 35.

Time is of the essence of the contract, and if the one party is not ready and able to perform his part of the agreement on the day fixed for the performance, the adverse party may elect to consider it at an end. 1 Peters, 455; 9 S. & M. 612; 7 How. 172.

Applying these principles to the circumstances of this case, we cannot think that the application to Pinson was made within the time required by law. In the short space of about forty minutes, at the most, he would have been compelled to leave his bed and go half a mile to his office, receive money, and perhaps draw notes and execute a title bond for the land. He states that he could not have transacted the business without going to his office. Herring did not see him in person, but he was well justified in believing that the whole business would have to be completed; and, if so, it could not have been settled without encroaching upon the Sabbath day.

But it is said that Blair was only bound by the terms of the agreement " to come to close the trade " within the time mentioned, that is to say, he was only required to make known that he accepted the terms. We cannot take this view of it. It appears by the letter that the terms had already been accepted by White, the agent of Blair, and all else that was required, was to ": close the trade." This was to be done by paying the money in cash, in part, and executing his notes for the residue, and receiving a title bond. Under these circumstances, the expression " come to close the trade," could only mean " come and close the trade." This is clearly the true intent of the letter, and it is manifest that it was so regarded by Blair, for he

Curtis et al. *v.* Blair.

undertook to send Herring to pay the money within the time stipulated.

Secondly, did Blair comply with his contract in substance, or did he offer to do so, within the time limited? It appears by the letters, that the terms of sale were to be one fourth of the purchase-money in cash, and the balance on credit of one, two, and three years. It is plain from this, that it was contemplated that notes should be executed for the purchase-money, and both parties seem so to have regarded it. Yet Herring did not bring or tender to Pinson, or offer to execute, nor was he authorized to execute, any notes for the credit portion of the purchase-money, so that a most material part of the business of "closing the trade," was wholly neglected.

Again. It appears from the pleadings and proofs in this case, that the ground of controversy is the mere pecuniary value of the lands in dispute. Both parties are contending for them, because they were worth more in the market than was proposed to be paid for them by Blair. The damages, therefore, for a breach of the contract, to be recovered in an action at law, would afford an ample redress; and courts of equity in such cases will not interfere except under special circumstances. 1 Sugd. Vend. 202; *Hepburn* v. *Dunlop*, 1 Wheat. 197; *Hepburn* v. *Auld*, 5 Cranch, 262; *Hatch* v. *Cobb*, 4 Johns. Ch. R. 559; 5 J. C. R. 193. In *Hester* v. *Hooker*, 7 S. & M. 778, it is said by this court, in speaking of bills of this character, that "no certain, definite rule can be laid down which would determine when a party was or was not entitled to such relief. Cases are numerous where both bill and cross-bill have been dismissed, and the parties respectively left to their remedies at law. Where the complainant has not done all that he stipulated to do, or has not placed himself in a situation to be ready to do so, upon compliance on the other side, the court will not interpose in his behalf."

Under these views, we do not think that Blair was entitled to a specific performance of the agreement from Curtis.

2. With much greater reason is he not entitled to have the sale to Crawford and Ayres vacated. They purchased the land from Pinson, after the failure of Blair to perfect the sale.

They had previously been informed of Blair's negotiation for the land by Pinson, and evinced any thing else but a disposition to interfere with it. They were, however, afterwards informed by Pinson that Blair had failed to complete the purchase, and, acting in faith of that assurance, they became the purchasers. If it be said that they had notice from Pinson of Blair's negotiation or purchase, or sufficient to put them on inquiry, and ought, by reason of that information, to have satisfied themselves that Blair had no right to the land, they also had notice from the same source that Blair's purchase had failed. They were as well justified in acting on the latter information as on the former; and, under the circumstances, they were not required to seek further information than that last derived from Pinson. See 2 Leading Cases in Eq., part 1, p. 104. It would not, therefore, be equitable to cancel the purchase which they have *bonâ fide* made; and a due regard for their equities would incline us to remit Blair to his remedy at law, if he has any, for the alleged breach of contract on the part of Curtis, rather than to compel a specific performance against Curtis, and deprive Crawford and Ayres of the benefits of their purchase.

The decree of the vice-chancellor is reversed, and the bill dismissed.